UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**KENYA N. SPRATT**, an Individual,

       Plaintiff,

v

**FCA US LLC,** a Delaware limited liability company,

       Defendant.
_____/

SOMMERS SCHWARTZ, P.C.
By:  Daniel D. Swanson (P29288)
Attorneys for Plaintiff
One Towne Square, Suite 1700
Southfield, Michigan 48076
(248) 355-0300
dswanson@sommerspc.com
_____/


## COMPLAINT AND DEMAND FOR JURY TRIAL


     **NOW COMES** Plaintiff, KENYA N. SPRATT, by and through his attorneys,

SOMMERS SCHWARTZ, P.C., and for his Complaint against Defendant, FCA US

LLC, states as follows:


1

## PARTIES

1.      Plaintiff, KENYA N. SPRATT ("SPRATT"), is an individual residing in the City of Detroit, Wayne County, Michigan.

2.      Defendant, FCA US LLC ("FCA"), a Delaware limited liability company, maintains its headquarters and conduct business in the City of Auburn Hills, Oakland County, Michigan.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction in connection with this case pursuant to 28 U.S.C. §1331 and 29 U.S.C. §2617(2).

4.      The events and conduct giving rise to the claims in this action occurred in this Judicial District.  Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

I.      **FCA**

5.      FCA describes itself as follows:

> FCA US LLC is a North American automaker with a new name and a long history. Headquartered in Auburn Hills, Michigan, FCA US is a member of the Fiat Chrysler Automobiles N.V. (FCA) family of companies. FCA US designs, engineers, manufactures and sells vehicles under the Chrysler, Dodge, Jeep, Ram and FIAT brands, as well as the SRT performance vehicle designation…. FCA, the seventh-largest automaker in the world based on total annual vehicle sales, is an international automotive group.

2

http://www.fcanorthamerica.com/company/AboutUs/Pages/AboutUs.aspx

6.     In 2016, FCA employed 83,000 people, sold 2.6 million vehicles, and maintained 37 manufacturing sites, 12 regional business centers, 23 parts distribution centers and 8 training and test facilities.

http://www.fcanorthamerica.com/company/AboutUs/Pages/AboutUs.aspx

## II.     SPRATT's CAREER AT FCA

7.     SPRATT is a 56 year-old African-American, who served with distinction and honor in both the United States Marine Corps and Army for a total of 14 years.

8.     Until his firing on April 18, 2017, FCA had employed SPRATT for 19 years, his last position being in Indirect Purchasing Group, where he worked as a Senior Construction Buyer.

9.     As a Senior Construction Buyer, SPRATT was responsible for FCA construction projects at all of its facilities.  This involved identifying qualified contractors, implementing and overseeing the competitive bidding process among qualified contractors, evaluating bids, communicating with both FCA management and bidders regarding the particulars of each project, and recommending to FCA the most qualified and low cost contractor for a project.

10.     SPRATT was an exemplary FCA employee. FCA recognized his outstanding job performance by awarding SPRATT annual merit pay increases and

bonuses.  In addition, prior to his termination, SPRATT was never subject to any sort of discipline by FCA during his entire career.

11.    In 2014 and 2015, the Michigan Minority Business Development Council nominated SPRATT to be the "Buyer of the Year".

12.    In FCA's Code of Conduct, Chief Executive Officer, Sergio Marchionne, wrote the following: "To act with integrity means that you are always seeking to do what is morally and ethically right."

13.    By using innovative and approved bidding processes and procedures and doing the right thing morally and ethically, SPRATT annually saved FCA tens of millions of dollars in construction project costs.

14.    In November 2015, SPRATT began reporting to Ms. Karen Hiatt, Indirect Purchasing Senior Manager.

## III.    THE MUSEUM RENOVATION PROJECT.

15.    In late 2016, FCA decided to convert the Chrysler museum building into offices for several of its Italian-based automobile divisions (the "museum renovation project"). The budget established for museum renovation project was $2.1 million.

16.    FCA headquarters facilities group (the "headquarters facilities group"), was responsible for the museum building (as it was located on the headquarters campus) and oversight of the museum renovation project.

4

17.    FCA assigned SPRATT to handle the process for selecting a qualified general contract for the museum renovation project.

18.    In accordance with FCA's standard practice and procedure, SPRATT prepared the paperwork (i.e. the competitive bid documentation, scope of work and specifications) to solicit bids from a list of pre-qualified general contractors.

19.    In the last week of December 2016, SPRATT sent a notification and invitation to bid for the museum renovation project to qualified general contractors and scheduled a meeting with the interested bidders to review the project in detail.

20.    Four contractors responded to the invitation and submitted bids, which only SPRATT reviewed.

21.    Critical to protecting the integrity of the bidding process and to identifying the most qualified and lowest cost bidder, was maintaining the confidentiality of the bids received.

22.    Subsequently, SPRATT prepared a detailed and confidential spreadsheet comparing the bidders projected cost for each aspect of the museum renovation project ("initial bid spreadsheet").

23.    One of the bidders, Barton-Malow, had an existing "Regional Construction Management" contract with FCA allowing it to handle all small (under $200,000) construction projects on the FCA headquarters campus.

24.     Immediately, the headquarters facilities group began pressuring SPRATT to forego the competitive bidding process and strongly recommended Barton-Malow as the general contractor for the museum renovation project.

25.     Concerned about possible corruption, SPRATT rejected this unusual request and rebuffed the pressure from the headquarters facilities group because he was intent on administering the bid process fairly and consistent with FCA practice and procedure.

26.     After receiving the general contractors' initial bids, SPRATT identified large dollar discrepancies as between the individual bidder's projected costs to perform specific tasks (i.e. electrical) involved with museum renovation project.

27.     In accordance with FCA's standard procedure, SPRATT invited three bidders to a January 20, 2017 clarification meeting with him and the FCA headquarters facilities group.  At that meeting, SPRATT conducted a review of the museum renovation project and discussed specific items in their bids where there were large dollar discrepancies between the bidders.

28.     In connection with that meeting, SPRATT provided the FCA Facilities group with a written summary of his technical cost comparison spreadsheet ("technical cost comparison spreadsheet").  SPRATT created this spreadsheet to initiate conversation with the general contractors during the clarification meeting

6

and to confirm that they had a clear understanding of the scope of work for those project tasks where there were large cost discrepancies among the bidders.

29.    The bidders' names were omitted from the technical cost comparison spreadsheet and several of the line items amounts from their bids did not match the exact amounts in their original bids.  SPRATT did this to ensure that the competitive bid process was fair, that the bids remained strictly confidential and difficult for anyone to determine a specific bidder's identity based on specific item bid amounts.

30.    This process of maintaining the confidentiality of contractor bids by masking the bidders' identities and modifying specific line item bid amounts, was a practice that SPRATT previously used with management's approval.

31.    Shortly after January 20, 2017 clarification meeting, three bidders submitted modified bids that were lower than their original bids.

32.    SPRATT prepared a spreadsheet summary of the final bids which identified the bidders' names were with their actual detailed line item bid amounts accurately stated ("final bid spreadsheet") and submitted it to the headquarters' facilities group.

33.    Roncelli was the lowest bidder on the museum renovation project; Roncelli built the original museum building.

34.    SPRATT recommended that FCA award Roncelli the museum renovation project contract based upon its low bid and meeting the project's technical requirements.

35.    SPRATT and Ms. Hiatt met with the headquarters facilities group the first week of February 2017.  At the conclusion of the meeting, Ms. Hiatt instructed SPRATT to award the bid to Barton-Malow.

36.    SPRATT was taken aback by FCA's decision to award the museum renovation project to other than the lowest qualified bidder. The decision was contrary to FCA's established practice and procedure to award such contracts to the lowest qualified bidder.

37.    SPRATT believed that the decision to award Barton-Malow the museum renovation project contract was the result of corruption.  Not only was this decision contrary to FCA's practices and procedures to award such contracts to the lowest qualified bidder and its Code of Conduct, but also it appeared to be a violation of state law (i.e. MCL 750.125 and MCL 750.280).

## IV.    SPRATT's COMPLAINTS TO FCA MANAGEMENT RE THE MUSEUM RENOVATION PROJECT.

38.    In February 2017, SPRATT met privately with Jay Wilton, Vice President of Indirect Purchasing.  SPRATT told Mr. Wilton about his concerns with the museum renovation project bidder/contractor selection process.

39.     In February and March 2017, SPRATT raised these same concerns with FCA Human Resource professionals.

## V.    FCA RETALIATES AGAINST SPRATT IN CONNECTION WITH HIS OPPOSITION TO CORRUPTION INVOLVING THE MUSUEM RENOVATION PROJECT.

40.     FCA directed SPRATT to attend a "construction" meeting on April 3, 2017.  Upon entering the meeting room, he was immediately confronted by three FCA investigators who interrogated him about the museum renovation project.

41.     At the conclusion of the April 3, 2017 meeting with investigators, FCA suspended SPRATT with pay.

42.     One of the investigators (Mr. Gordon) escorted SPRATT out of the building and as they walked, told him that the meeting "was just a formality" and that he "had nothing to worry about".  Specifically, Mr. Gordon referred to Mr. Patrick Bergin (a white male) who SPRATT replaced as a Construction Buyer.

43.     Mr. Gordon told SPRATT that he conducted an investigation into Bergin's practices as a Construction Buyer and that the allegations against him (SPRATT) were "nothing" compared to the allegations against Bergin. Significantly, while FCA removed Bergin from the indirect purchasing group, Bergin today remains employed by FCA in another position.

44.     By way of an April 18, 2017 letter, FCA informed SPRATT that it was firing him for allegedly "altering line items in vendor bids".

9

45.     SPRATT's firing was contrary to FCA's non-retaliation, non-discrimination and progressive discipline policies.

## VI.     **SPRATT's INTERMITTENT MEDICAL LEAVE.**

46.     SPRATT required ongoing medical treatment for leukemia, which he suffers from in connection with his military service and for which, the Veterans Administration declared him to be entitled to full service related disability benefits.

47.     SPRATT disclosed to FCA management his serious health condition and his need for periodic medical treatment/procedures at the Veteran's Hospital in Detroit.  SPRATT was required to be off work for several hours from week to week to obtain necessary medical treatment.

48.     Contrary to the Family and Medical Leave Act ("FMLA", 29 USC 2601 *et seq.*), FCA failed or refused to inform SPRATT of his rights under the FMLA regarding intermittent medical leave and to provide him with FMLA forms for obtaining such leave.

49.     In connection with his need for intermittent leave to receive treatment for leukemia, Ms. Hiatt communicated that SPRATT was a "liar".

50.     Further, Ms. Hiatt engaged in various retaliatory behaviors toward SPRATT including, but not limited to, her refusal to approve his expense reports, instruction that he not communicate with FCA management directly without her

10

prior approval, failure to approve his travel authorizations to visit plants in connection with construction activities and initiation/approval of his firing.

<u>COUNT I:</u><br>
<u>WRONGFUL DISCHARGE IN VIOLATION OF</u><br>
<u>MICHIGAN PUBLIC POLICY</u>

51.     SPRATT incorporates by reference paragraphs 1 through 50 of his Complaint.

52.     Michigan's public policy is to promote adherence to its statutes and regulations.

53.     Further, Michigan's public policy is to protect an employee from being discharged in retaliation for his failure or refusal to violate the law in the course of his employment and for reporting the illegal actions to management.

54.     Michigan statutes (i.e. MCL 750.280 and MCL 750.125) prohibit employees from engaging in corrupt and fraudulent behavior in the course of performing their job duties.

55.     SPRATT was concerned that FCA employees were engaged in corrupt and fraudulent activities to the detriment of FCA by seeking to circumvent, rig and/or violate the FCA competitive bid processes and procedures for awarding the contract in connection with the museum renovation project.

56.     SPRATT refused to follow headquarters facility group's direction to circumvent and/or rig the FCA competitive bid process and procedure for

11

construction contract awards and further, took additional necessary steps to protect the integrity of that process and procedure.

57.    Further, SPRATT communicated to FCA management and human resources his concerns about corruption involving the FCA competitive bid process and procedures for construction contract awards being violated in connection with the museum renovation project.

58.    FCA retaliated against SPRATT by, among other things, terminating his employment because he refused to violate the law by circumventing and rigging FCA competitive bid process and procedures for construction contract awards in connection with the museum renovation project and for communicating his concerns about this to FCA management and human resources.

59.    As a direct and proximate result of FCA illegally firing SPRATT, he has suffered damages including, but not limited to, loss of wages, fringe benefits, mental, emotional and physical distress and attorney fees.

**WHEREFORE**, Plaintiff, KENYA N. SPRATT, requests that this Court enter its Judgment against Defendant, FCA US LLC, in whatever amount of damages is shown to be established by the proofs in this cause, together with compensatory damages, liquidated damages, costs, pre-complaint, pre-judgment and post-judgment interest, and attorney fees.

**DEMAND FOR TRIAL BY JURY IS HEREBY MADE.**

12

## COUNT II:
## VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e et seq.

60.     SPRATT incorporates by reference paragraphs 1 to 50 of his Complaint.

61.     At all relevant times, FCA was SPRATT's "employer" as defined by Title VII of the Civil Rights Act of 1964, 42 § U.S.C. § 2000e-2 et seq. ("Title VII").

62.     SPRATT is of the African-American race and a member of the classes of individuals protected by Title VII.

63.     At all relevant times, FCA had a duty under Title VII not to discriminate against SPRATT because of his race.

64.     FCA violated SPRATT's civil rights under Title VII in ways which included, but were not limited to, the following:

   a.     Terminating his employment.

   b.     Failing to follow its corporate policies and procedures including, but not limited to, progressive discipline policy, non-retaliation and non-discrimination policies and its Code of Conduct.

   c.     Failing and refusing to place SPRATT in a comparable position despite FCA past practice of doing this for Caucasian employees in similar circumstances.

   d.     Other acts and/or omissions that may become known during discovery.

65.     SPRATT suffered damages as a direct and proximate result of Defendants' unlawful discrimination, including but not limited to, loss of

compensation, loss of benefits, mental, emotional and physical distress, and attorney's fees and costs.

**WHEREFORE**, Plaintiff, KENYA N. SPRATT, requests that this Court enter a Judgment in his favor and against Defendant, FCA US LLC, for an amount consistent with the evidence, including, but not limited to, back pay/wages and benefits, front/future pay/wages and benefits, or reinstatement in lieu thereof, compensatory damages, costs incurred in this litigation, punitive damages, pre-complaint interest, pre-judgment interest, post-judgment interest, and reasonable attorney fees.

### DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

### COUNT III:
### VIOLATION OF FAMILY AND MEDICAL LEAVE ACT,
### 29 U.S.C. §2601 *et seq*. — INTERFERENCE

66.    SPRATT incorporates paragraphs 1 through 50 of his Complaint.

67.    It is unlawful under the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq*. ("FMLA), for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA. 29 U.S.C. §2615.

68.    The FMLA entitles qualified employees to take up to twelve weeks of unpaid leave, without fear of termination, when the leave is taken for a serious

health condition that makes the employee unable to perform the functions of their job.  29 U.S.C. §2612(a)(1)(D).

69.    A serious health condition is "an illness, injury, impairment, or physical or mental condition" that involves "continuing treatment by a health care provider". 29 U.S.C. §2611(11).

70.    Employers are prohibited from interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right.  29 U.S.C. §2615(a)(1).

71.    SPRATT was an eligible employee for an FMLA leave. 29 U.S.C. §2611(2).

72.    FCA was SPRATT's employer. 29 U.S.C. §2611(4).

73.    SPRATT was entitled to leave under the FMLA. 29 U.S.C. §2612(a)(1).

74.    FCA was on notice of SPRATT taking an FMLA leave due to a serious health condition. 29 U.S.C. §2612(e)(1).

75.    FCA denied SPRATT the FMLA benefits to which he was entitled. 29 U.S.C. §2612(e)(1).

76.    FCA engaged in a prohibited acts under the FMLA by failing or refusing to appropriately respond to SPRATT's intermittent leave requests in ways which included its failure to provide him with a written Employer Response to Employee Request for Family and Medical Leave, falsely communicating that

15

SPRATT was a "liar" regarding his need for leave due his leukemia and ultimately, firing him. 29 U.S.C. §2614.

77.    FCA knowingly and deliberately engaged in intentional violations of the FMLA and further, acted with malice and/or with reckless indifference to SPRATT's rights under the FMLA.

78.    As a direct and proximate result of FCA's adverse actions, SPRATT has suffered damages.

**WHEREFORE**, Plaintiff, KENYA N. SPRATT, requests that this Court enter its Judgment against Defendant, FCA US LLC, in whatever amount of damages is shown to be established by the proofs in this cause, together with compensatory damages, liquidated damages, costs, pre-complaint, pre-judgment and post-judgment interest, and attorney fees in accordance with 29 U.S.C. § 2617(a)(3) as well as any equitable relief shown to be established by the proofs in this cause.

### DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

### COUNT IV:
### VIOLATION OF FAMILY AND MEDICAL LEAVE ACT,
### 29 U.S.C. §2601 *et seq*. — RETALIATION

79.    SPRATT incorporates paragraphs 1 through 50 and 66 through 78 of his Complaint.

80.    FCA was on notice of SPRATT taking intermittent leave due to a serious health condition.

16

81.   The FMLA prohibits employers from retaliating against employees who exercise their FMLA rights. 29 U.S.C. §2615(a)(2).

82.   As a result SPRATT taking an FMLA leave and exercising his FMLA rights, FCA retaliated against him and violated the FMLA in ways which include, but are not limited to, the following:

   a.   Communicating that SPRATT was a "liar" relative to his taking FMLA leave;

   b.   Engaging in various acts of retaliation against SPRATT;

   c.   Terminating SPRATT's employment; and

   d.   Otherwise discriminating against SPRATT because of his FMLA leave.

83.   There is a causal connection between SPRATT's protected FMLA activity and FCA's adverse employment actions.

84.   FCA knowingly and deliberately engaged in intentional violations of the FMLA and further, acted with malice and/or with reckless indifference to SPRATT's rights under the FMLA.

85.   As a direct and proximate result of Defendants' adverse actions, SPRATT has suffered damages.

**WHEREFORE**, Plaintiff, KENYA N. SPRATT, requests that this Court enter its Judgment against Defendant, FCA US LLC, in whatever amount of damages is shown to be established by the proofs in this cause, together with compensatory damages, liquidated damages, costs, pre-complaint, pre-judgment and post-

17

judgment interest, and attorney fees in accordance with 29 U.S.C. § 2617(a)(3) as well as any equitable relief shown to be established by the proofs in this cause.

**DEMAND FOR TRIAL BY JURY IS HEREBY MADE.**

> s/Daniel D. Swanson
> DANIEL D. SWANSON (P29288)
> SOMMERS SCHWARTZ, P.C.
> Attorneys for Plaintiff
> One Towne Square, Suite 1700
> Southfield, Michigan 48076
> (248) 355-0300

Dated:  August 29, 2017