UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KENYA N. SPRATT,

        Plaintiff,                             Case No. 17-12844
vs.                                       HON. MARK A. GOLDSMITH

FCA US LLC,

        Defendant.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 26)**

This matter is before the Court on Defendant FCA US, LLC's motion for summary

judgment (Dkt. 26). FCA terminated Plaintiff Kenya Spratt's employment after it discovered that

he had modified contractor bids on internal company documents. After his termination, Spratt

filed a four-count complaint alleging the following: wrongful discharge in violation of Michigan

public policy (Count I); race discrimination in violation of Title VII of the Civil Rights Act of

1964 (Count II); interference with the Family and Medical Leave Act ("FMLA") (Count III); and

retaliation in violation of the FMLA (Count IV). The issues have been fully briefed. Because oral

argument will not aid the decisional process, the motion will be decided based on the parties'

briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons that follow, FCA's

motion is granted.

## I.    BACKGROUND

### A. The Museum Project

Spratt, an African-American, worked as an at-will employee for FCA from 1998 until April

2017. Spratt Dep., Ex. J to Def. Mot., at 21:4-23:4 (Dkt. 26-11); Def. Statement of Material Facts

("DSMF"), ¶¶ 1, 31 (Dkt. 26). Spratt became a Senior Buyer in 2014 when his predecessor, Patrick Bergin (Caucasian), was investigated for allegedly receiving kickbacks from a supplier. DSMF ¶ 31. The investigation found that the evidence of kickbacks was inconclusive. 2014 Investigative Report, Ex. C to Pl. Resp. (Dkt. 27-4). Bergin was removed as a Senior Buyer, but was promoted to a plant facilities engineering supervisor position and received an increase in pay. Pl. Statement of Material Facts ("PSMF") ¶¶ 56-57 (Dkt. 27). Spratt was subsequently promoted to the Senior Buyer position and held the position until his termination in April 2017.

As a Senior Buyer, Spratt was responsible for identifying potential bidders for construction projects, soliciting bids, processing bids, and selecting the vendor to whom a contract would be awarded, all in consultation with an internal client. DSMF ¶ 2. Contractors are selected through various means. A common method for large projects is the competitive bidding process. Spratt Dep. at 21:21-25. FCA does not have written guidelines detailing the competitive bidding process. Id. at 22:15-21. The process has been developed informally over the years and passed down from one buyer to the next. Id. at 22:22-25.

The competitive bidding process invites a small number of contractors suggested by the internal client and a Senior Buyer to submit bids for a given project. Id. at 38:14-18. The Senior Buyer then compiles the bids into a technical cost sheet for the internal client that breaks down the relevant costs. Id. at 43:25-44:4; 47:9-13. The technical cost sheets are used at clarification meetings with the client, the contractors, or both to ensure that the contractors have a proper understanding of the scope of the work. Id. at 44:4-6; 47:19-48:2. The names of the contractors are not provided on the technical information sheet to help protect the integrity of the bidding process and because the names are not needed to identify variances in cost estimates. Id. at 48:24-

49:4.  After clarification meetings, contractors are allowed to resubmit their best and final bids.  Id. at 49:8-11.

Typically, the lowest bidder is awarded the contract.  Id. at 60:16-25.  However, there is no FCA policy that requires contracts automatically go to the lowest bidder.  Id. at 63:11-15.  For example, if the internal client does not feel "comfortable" with the lowest bidder, the internal client may reject the contractor in favor of another.  Id. at 61:21-63:15.  According to Spratt, when this occurs, the internal client escalates the matter to his supervisor, and then Spratt awards the contract to the higher bidder based on his supervisor's direction.  Id. at 63:2-9.

In late 2016, the FCA Facilities Group sought a general contractor to convert the Chrysler Museum into office space (the "Museum Project").  DSMF ¶ 6.  The Museum Project was budgeted for a little over two million dollars.  Spratt Dep. at 79:1-4.  Spratt was asked to identify potential contractors for the project.  Id. at 32:5-18.  Spratt and the Facilities Group agreed to invite four contractors to bid on the Museum Project: three recommended by the Facilities Group, including Barton Malows, and one recommended by Spratt, which was Roncelli.  Id. at 38:3-24.  Id.  Each of the contractors submitted bids.  Id. at 43:15-18.

After the bids were submitted, Spratt analyzed and prepared the technical cost sheet.  Id. at 43:25-44:4; 47:9-13.  However, based on a previous parking lot project (the "Lot 29 Project"), Spratt had become suspicious that the Facilities Group was compromising the integrity of the competitive bidding process.  Id. at 48:23-49:23.  After the Lot 29 Project clarification meeting, to Spratt's surprise, one of the contractors significantly reduced its bid, and was eventually awarded the Lot 29 Project.  Id. at 49:14-17.  Spratt later learned, after the project had begun, that the contractor was able to significantly reduce its bid by using substandard materials.  Id. at 49:18-23.  Spratt became concerned that someone within the Facilities Group had shared the bids with their

preferred contractor, which gave the Lot 29 contractor an unfair advantage. Id. at 50:7-11. Spratt believed that the only way that the contractor could have known to reduce the bid was to have inside knowledge. Id. at 52:8-22. Spratt admits, however, that he has no evidence to support his theory. Id. at 53:8-12.

To protect the integrity of the competitive bidding process, Spratt decided to take matters into his own hands. Without notifying his supervisors or anyone else, Spratt increased and decreased some of the numbers on the Museum Project technical cost sheet. Id. at 50:12-21. The idea was that if someone in the facilities group had a copy of a contractor's bid (which, according Spratt, they should not have), they would not know for sure which contractor's bid belonged to which contractor based on the numbers. Id. Spratt's modifications cumulatively inflated Barton Malow's bid by over $260,000 and one of the other contractor's bid by more than $27,000. DSMF ¶ 12. Roncelli and another bidder's numbers were left untouched. Id. Even though Barton Malow submitted the lowest initial bid, the inflated numbers gave the (erroneous) impression that Roncelli was the lowest bidder. Id.

The Facilities Group and Spratt eliminated the highest bidder and then invited the remaining three contractors to a clarification meeting, which included Barton Malow and Roncelli. Spratt Dep. at 55:18-56:14. Actual bid amounts were not discussed at the clarification meeting, just the scope of the work. Id. at 57:19-23. After the meeting, the three remaining contractors submitted their final bids for the project. DSMF ¶ 15. This time Roncelli was the lowest bidder, followed closely by Barton Malow. Id. ¶ 16. Spratt prepared a final cost comparison sheet, which contained accurate information. Spratt Dep. at 75:22-24. Spratt informed the Facilities Group that Roncelli was the lowest bidder and recommended that it be awarded the project. DSMF ¶ 17.

However, the Facilities Group did not feel comfortable with awarding the contract to Roncelli. A meeting was held to discuss the Facilities Group's reservations concerning the Museum Project. Spratt Dep. at 73:15-19. Spratt believes that the Facilities Group's objections to Roncelli were baseless. Id. 73:16-74:8. Spratt said that "after everyone made their comments and concerns, the bottom line is I was instructed by [my supervisor] to award the project to Barton Malow. She gave me the direct order to award the project. I'm like not a problem." Id. at 74:9-14. But Spratt believes that the Facilities Group's resistance was due to some type of collusion with Barton Malow. Id. at 74:15-18.

Unknown to Spratt, FCA's Internal Audit and Compliance Department ("Audit") was investigating the Museum Project bidding process right around the time of the clarification meeting. See Stajninger Dep., Ex. K to Def. Mot., at 47:3-23 (Dkt. 26-12). It is not clear how Audit became involved. It appears that it was triggered by one of the Facilities Group's architects, Slavko Stajninger, who discovered that the technical cost sheet was not accurate. According to Stajninger, he inadvertently learned of two of the initial bids. Id. at 56:1-57:11. One of the four contractors had attached its initial bid to an email sent to Spratt and Stajninger, and the day before the clarification meeting, Barton Malow's representative volunteered Barton Malow's initial bid during a walkthrough on another project. Id. Stajninger noticed the discrepancies on the technical cost sheets and discussed it with his supervisors. Id. at 60:6-10. One of Stajninger's supervisors directed him to ask for the initial bid information from Spratt. Id. at 61:20-62:10. Spratt refused Stajninger's request to provide the initial bid information. Id. at 63:2-4. Stajninger's supervisor then raised the issue with Spratt's supervisor. Id. at 63:9-15.

FCA's Business Practices & Corporate Investigations team subsequently investigated Spratt's activities. Investigative Report, Ex. B to Def. Mot. (26-3). When asked about the altered

bids, Spratt denied altering the information.  Id. at 2.  Even when presented with the altered

documents, he said that he only "cut and pasted" the information into the technical cost sheets.  Id.

"Spratt stated that there must have been a mistake, as he does not change numbers on his

worksheets."  Id. at 9.  Eventually, when presented with the initial bids and the altered technical

cost sheets, Spratt admitted that he had "massaged" the numbers, because he believed that Barton

Malow had supplied the Facilities Group with their original bid.  Id.  When asked if he knew that

the Facilities Group had a copy of the initial bid, Spratt admitted that it was just speculation.  Id.

The investigation, among other things, also uncovered that Spratt had a personal relationship with

the Roncelli representative.  Id. at 3.  The Investigative Report was submitted on April 12, 2017.

Id. at 1.  FCA terminated Spratt  a few days later.  DSMF ¶ 31.  Spratt was later replaced by a

Caucasian employee.  Def. Mot. at 18 n.1.

## B.  Requests to Take Leave

Spratt has two counts related to time-off requests.  When asked about his requests for time

off, Spratt made the following statement:

> Q.  . . . did you request time off for medical treatments more than once from [your supervisor]?
>
> A.  I didn't request any time off from her.  I would just take the time. I would try to schedule those appointments early in the morning, because I would have to pass the VA going to work.  And either I can stop at the VA – it all depends on what the situation was. I can receive those treatments, [sic] make it into work. So I would schedule them first thing in the morning, like, eight in the morning, so I could be out of there by nine sometimes and be at work around 10. Or, just like I said, it depends on what type of procedure I would have to receive at that particular time.
>
> Q. Okay. The ones where you would be out two or three days, did you schedule those off?
>
> A. Two or three days? I would just put them on my – I would send [my supervisor] a meeting notice in terms of work from home.
>
> Q. But in those instances, you didn't tell her why.

A. No. The process or procedure when they – this work-from-home process was new. And when they rolled it out to everyone within FCA, they said, 'If you have to work from home, it's not required to tell your manager why you're working from home or what reason. You're working from home, and that's the only thing. As long as your end customer [sic] – you're still supporting your customer, you're fine from working at home.' Now, for some of the days that I requested more than one day, it was when my son was born. And as I indicated earlier, my wife – my son was born in the Dominican Republic. So in terms of working from home, I can be in Detroit working from home. I can be in Pontiac working from home. I just so happened to have an apartment in Santiago, Dominican Republic, where my wife and son lived, and I was working from there. So in terms of supporting my customers here in Michigan or everywhere else where I had projects, I was still able to support them, communicate with them.

Spratt Dep. at 113:8-114:25. After FCA's attorney presented Spratt with the email thread between

Spratt and his supervisor, Spratt made the following clarification:

Q. Go back to my initial question. You didn't ask for time off work. You asked to be allowed to work from home; correct?

A. Exactly.

Id. at 119:24-120:2.

Q. Okay. So there's no time off at all.

A. No, there was not.

Q. Okay. And as a salaried employee, you received pay for that time.

A. Yes.

Id. at 121:20-24.

## II.  STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the

governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III.    ANALYSIS

### A.  Wrongful Discharge in Violation of Michigan Public Policy (Count I)

FCA argues that Spratt's wrongful discharge in violation of Michigan public policy should be dismissed, because it says that Spratt admits that he did not refuse to violate the law nor did FCA ask him to violate the law. Def. Mot. for Summ. J. ¶ 2. Spratt argues that FCA violated its own procedures and likely received kickbacks from Barton Malow in violation of public policy. Pl. Resp. at 16-17. Spratt's arguments are without merit.

Generally, an at-will employee in Michigan may be terminated "at any time for any, or no, reason." Suchodolski v. Michigan Consol. Gas Co., 316 N.W.2d 710, 711 (Mich. 1982). However, Michigan law recognizes a cause of action for at-will employees who are discharged in a manner that is "so contrary to public policy as to be actionable." Id. For example, terminating an at-will employee violates public policy if "(1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by

8

a well-established legislative enactment." McNeil v. Charlevoix Cty., 772 N.W.2d 18, 24 (Mich. 2009) (citing Suchodolski, 316 N.W.2d at 711-712). "Although this list was described as 'three examples' by the Michigan Supreme Court, the Michigan Supreme Court has never recognized a claim that does not fit into this framework." Hoven v. Walgreen Co., 751 F.3d 778, 783 n.1 (6th Cir. 2014) (quoting McNeil, 772 N.W.2d at 24) (internal citation omitted).

To sustain a claim for public policy wrongful discharge, a plaintiff must show (1) that he or she engaged in protected activity, (2) that he or she was discharged, and (3) a causal connection between the plaintiff's protected activity and the discharge. Authier v. Ginsberg, 757 F.2d 796, 798 (6th Cir. 1985) (citing Clifford v. Cactus Drilling Corp., 353 N.W.2d 469, 474 (Mich. 1982)). Spratt does not argue that he was discharged in violation of an explicit legislative statement or for exercising a right conferred by a well-established enactment. He argues only that he was discharged for the failure or refusal to violate the law in the course of his employment. Spratt makes two arguments in support of this contention.

First, he argues that FCA violated public policy by failing to follow its own policies and procedures with respect to the competitive bidding process. Spratt's first argument is flawed, because corporate policies and procedures are simply not public policies. Suchodolski, 316 N.W.2d at 712 (finding that "[t]he code of ethics of a private association does not establish public policy"). Furthermore, FCA followed its own policies. Spratt asserts that Roncelli, as the lowest bidder, should have been awarded the Museum Project. But Spratt admits that the lowest bidder does not always receive the award. According to Spratt, if the internal client does not feel comfortable with the lowest bidder, then the client can escalate the matter to a supervisor, who can direct the buyer to award the contract to a higher bidder. That is what happened here. Spratt said that the Facilities Group did not feel comfortable with Roncelli; the Facilities Group escalated the

matter to Spratt's supervisor; and that supervisor gave Spratt a direct order to award the project to

Barton Malow. Spratt Dep. at 74:9-14. This is consistent with the process described by Spratt.

Second, he argues that he had a good-faith belief that FCA was colluding with Barton

Malow or receiving kickbacks from Barton Malow in violation of Michigan law. Pl. Resp. at 16-

17. Spratt argues that FCA's conduct "implicates" at least two Michigan statutes: Michigan

Compiled Laws §§ 750.280 (fraud) and 750.125 (corruption). However, Spratt's own testimony

belies his second argument.

Spratt argues in his brief that he "believed that the facilities group's violations of FCA

processes and procedures also constituted violations of law." Pl. Resp. at 18. However, when

asked what Spratt meant by an "illegal" copy of Barton Malow's initial bid, he said the following:

> A. I'm not saying it's against the law. But it's against our – based on my understanding of FCA's purchasing processes and procedures, all competitive bid information is supposed to come from purchasing and distributed to other parties within FCA. If anyone deviates or circumvents that process, I would consider it illegal or not within FCA's processes and procedures.
>
> . . .
>
> Q. So when you say 'law,' you're using the term to refer to a private – or a company's policies and procedures.
>
> A. Correct.
>
> Q. You're not referring to a federal or state statute.
>
> A. Okay.
>
> Q. Is that correct?
>
> A. I'm referring to within FCA's processes and procedures.

Spratt Dep. at 124:7-15, 125:6-14. Spratt's testimony is clear that he was strictly concerned with

violations of FCA's internal policies, which, as already mentioned, are not public policies. Spratt's

assertion that he believed that the Facilities Group's actions violated a law is not supported anywhere in the record.

Additionally, Spratt has a causation problem. Even assuming that FCA's actions violated Michigan's fraud and corruption laws, he never raised those concerns with anyone at FCA. Every communication in the record relates to violation of FCA's internal procedures. See 1/27/2017 Spratt/Stajninger email, Ex. I. to Pl. Resp. (Dkt. 27-10) (explaining that "[n]ot moving forward with the Contractor (Roncelli) who met our technical and cost requirement for this project would compromise the integrity of our competitive bid process and the integrity of FCA"); see also 2/11/2017 email to Vice President of Purchasing, Ex. J to Pl. Resp. (Dkt. 27-11) (noting that his supervisor instructed him to "award projects to Contractors who were not the most competitive"). To the extent Spratt can argue that he refused to violate a Michigan law in the course of his employment, he cannot show a causal connection between his refusal and his termination when he never communicated to FCA that it was violating Michigan law in some fashion. Accordingly, FCA's motion is granted on Spratt's wrongful discharge in violation of public policy claim.

## B. Race Discrimination in Violation of Title VII (Count II)

FCA argues that Spratt's race discrimination count should be dismissed, because Spratt can offer no evidence that he was treated differently than a similarly situated employee, that the reasons for his discharge were a pretext for discrimination, or that the real reason for the termination of his employment was his race. Def. Mot. for Summ. J. ¶ 3. Spratt argues otherwise. Spratt, however, misses the mark.

Title VII prohibits an employer from discharging "any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a).

11

Because Spratt offers no direct evidence of discrimination, the Court employs the familiar McDonnell Douglas burdening-shifting framework used to establish discrimination by circumstantial evidence. Wheat v. Fifth Third Bank, 785 F.3d 230, 237 (6th Cir. 2015).

Under the three-step McDonnell Douglas framework, the first step requires the plaintiff to establish a prima facie case of discrimination. Id. The second step requires the employer to articulate legitimate, nondiscriminatory reasons for the adverse employment action. Id. And, if the employer meets its burden, the third step requires the plaintiff to show that the employer's nondiscriminatory reasons were pretext for discrimination. Id.

Spratt's burden of establishing a prima facie case of race discrimination is not onerous. Id. To establish a prima facie case for race discrimination, Spratt must show that "(1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." Laster v. City of Kalamazoo, 746 F.3d 714, 727 (6th Cir. 2014).

FCA does not does not dispute the first three elements of the prima facie case. It does, however, dispute that Spratt was treated less favorably than a similarly situated individual. And FCA attempts to dismiss that Spratt was replaced by a person outside of his protected class, because the other Senior Buyer is African American. Def. Mot. at 16-17, n.1. FCA is partially correct.

Bergin, Spratt's predecessor, was not similarly situated to Spratt. To be similarly situated, "the plaintiff must show that 'all of the relevant aspects of his employment situation were 'nearly identical' to those of the comparable employee's employment situation.'" O'Donnell v. City of

Cleveland, 838 F.3d 718, 727 (6th Cir. 2016) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)) (some internal marks omitted). "For example, the comparables 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). There is no question that Bergin held the same position as Spratt and that both he and Spratt were under Vice President Jay Wilton (although not directly). However, although the alleged improper conduct is arguably similar, the results of the investigations are significantly different. Spratt admitted that he falsified documents and Bergin's investigation was inconclusive. The trier of fact cannot speculate what Wilton would have done had Bergin's investigation found conclusively that Bergin was accepting kickbacks. Therefore, Bergin is not similarly situated to Spratt in all relevant aspects.

Although Spratt cannot meet his prima facie case burden by comparing his employment situation to Bergin's, his burden is met by FCA's admission that Spratt was replaced by an individual outside of his protected class. FCA's attempt to dismiss this point by pointing to other African-American FCA employees is unavailing considering Spratt's light burden at the prima facie case stage of the analysis. Therefore, Spratt has established a prima facie case of discrimination based on race.

Because Spratt has established a prima facie case of discrimination, FCA must articulate a legitimate, nondiscriminatory reason for Spratt's termination. FCA's burden "'is one of production, not persuasion.'" Wheat, 785 F.3d at 239 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). FCA says that Spratt was terminated because he falsified contractor bids. Given FCA's justification, the burden shifts back to Spratt to show that FCA's

reason for his termination was actually pretext for discrimination. "Pretext can be shown by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." Id. at 240.

There is no dispute that FCA's stated reason has sound factual support, because Spratt admitted that he falsified contractor bids. And Spratt, as an at-will employee, cannot argue that FCA's stated reasons were insufficient to warrant termination, because his employment could be terminated "at any time for any, or no, reason." Suchodolski, 316 N.W.2d at 711. Therefore, Spratt must show that FCA's stated reason did not motivate its decision, a burden he cannot meet based on the record before the Court.

Spratt fails to offer anything other than a regurgitation of his prima facie case argument with respect to Bergin. However, as already discussed above, Bergin is not an appropriate comparator. The only evidence offered by Spratt of any potentially racially motivated action by any FCA employee is that he was replaced by someone outside of his protected class. But that evidence alone is not enough to send this case to a jury. "A mere scintilla of evidence . . . is insufficient to forestall summary judgment." Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017). Therefore, FCA's motion must be granted on Spratt's Title VII claim of discrimination.

## C. Interference and Retaliation in Violation of the FMLA (Counts III & IV)

FCA argues that Spratt's FMLA claims should be dismissed because Spratt admits that he never requested a leave of absence under the FMLA or otherwise. Def. Mot. for Summ. J. ¶ 4. Spratt argues that FCA had sufficient knowledge of his FMLA-qualifying reasons for leave to trigger obligations under the FMLA. Pl. Resp. at 21. FCA has the better part of the argument.

The FMLA entitles employees to twelve weeks of unpaid leave during any twelve-month period for, among other things, birth of a child and serious employee health conditions. 29 U.S.C. § 2612(a)(1). The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA:" the "interference theory" and the "retaliation theory." Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004). Under the interference theory, an employer may not "interfere with, restrain, or deny the exercise of" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1). Under the retaliation theory, the FMLA prohibits an employer from retaliating against an employee who opposes "any practice made unlawful by" the FMLA. Id. at § 2615(a)(2). The McDonnell Douglas burden-shifting framework applies to both theories. Hoge, 384 F.3d at 762.

To establish a prima facie case of FMLA interference, Spratt must show, among other things, that he gave FCA notice of his intent to take leave and that FCA denied his FMLA benefits or interfered with his FMLA rights. Groening v. Glen Lake Cmty. Sch., 884 F.3d 626, 631 (6th Cir. 2018). Similarly, to establish a prima facie case of FMLA retaliation, Spratt must show that he was engaged in an activity protected by the FMLA and that FCA knew that he was exercising his rights under the FMLA. Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012). The dispute between the parties is limited to whether Spratt actually took leave and then properly notified FCA that he was taking FMLA-leave.

Spratt argues that even though he did not directly notify FCA that he was taking FMLA leave, FCA was aware that he took time off for the birth of his son and to receive treatment for his own medical conditions. Pl. Resp. at 20-21. Spratt is correct that "when the employer acquires knowledge that an employee's leave may be for an FMLA–qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days,

absent extenuating circumstances." 29 C.F.R. § 825.300(b).  However, FMLA obligations are not triggered unless leave is requested in some fashion or actually taken.

Spratt cannot establish a prima facie case of FMLA interference or retaliation, because he admits that he did not take any time off and that he was paid for the days he worked from home. Spratt Dep. at 121:20-24.  The FMLA entitles employees to twelve weeks of unpaid leave during any twelve-month period.  29 U.S.C. § 2612(a)(1).  Spratt never requested leave.  Spratt only ever made requests to work from home.  "But working from home is still working; so that request was not a request for leave under the FMLA."  Anderson v. McIntosh Const., LLC, 597 F. App'x 313, 314 (6th Cir. 2015).  Moreover, Spratt was never denied a request to work from home.  According to Spratt, when he needed to work from home, he "would just take the time."  Spratt Dep. 113:11. Therefore, Spratt has failed to establish a prima facie case for FMLA interference and retaliation. Accordingly, FCA's motion must be granted as to those two claims.

## IV.    CONCLUSION

For the reasons set forth above, FCA's Motion for Summary Judgment (Dkt. 26) is **GRANTED**.

SO ORDERED.

Dated:  March 25, 2019                                  s/Mark A. Goldsmith
     Detroit, Michigan                                MARK A. GOLDSMITH
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 25, 2019.

                                    s/Karri Sandusky
                                    Case Manager